# In the United States Court of Federal Claims

No. 13-924L
(Filed: August 18, 2017)
NOT FOR PUBLICATION

* * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| GADSDEN INDUSTRIAL PARK, LLC, | False Claims Act; Reckless disregard of truth or falsity. |
| *Plaintiff*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

* * * * * * * * * * * * * * * * * * * *

_____

OPINION

_____

Plaintiff Gadsden Industrial Park, LLC ("GIP") initiated this as a fifth amendment takings claim. It asserted that the government, operating through the Environmental Protection Agency ("EPA"), took plaintiff's personalty located at a former steel mill site during a CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act[1]) operation. The former mill operator had gone into bankruptcy, and GIP later acquired approximately 25 miles of railroad track traversing the site from an entity which had purchased the assets from the bankruptcy estate. Defendant was permitted to amend its answer to assert a fraud counterclaim, in which it contends that counsel for GIP made materially false statements to the EPA in asserting GIP's demand for compensation for the track it alleged was taken.

---

[1] 42 U.S.C. §§ 9601-9675 (2012).

On January 30, 2017, defendant filed a motion for summary judgment on GIP's affirmative claim, and plaintiff later indicated its intent not to dispute the motion. Accordingly, the court granted defendant's motion for summary judgment on March 31, 2017 but deferred entry of final judgment due to the pendency of the counterclaim. We then set the matter for trial, which was held on June 30, 2017. At the conclusion of trial, the court announced its decision to deny the counterclaim for the reasons outlined herein.

BACKGROUND

GIP is a limited liability company formed by the Casey family, which operates a business in Pennsylvania, Casey Equipment, which primarily buys and sells equipment and parts associated with the steelmaking industry. Don Casey, founder of Casey Equipment, is the managing partner of GIP, an independent entity formed for the sole purpose of owning and operating an industrial park in Gadsden, Alabama. He testified at trial.

The land and buildings which form the principal assets of GIP were purchased directly or indirectly out of the bankruptcy estate of Gulf States Steel, which, along with its predecessors, had operated a steel mill in Gadsden, Alabama for decades. The track at issue in plaintiff's claim is part of a much larger system of track. GIP purchased 420 acres of land underlying most of the track from an overall site of approximately 761 acres. It also acquired track on an adjoining parcel of land that it did not purchase (referred to hereafter as the "excluded property"). The excluded property was the site of multiple piles of slag and waste material which accumulated during the life of the steel mill. There were at least six spur lines leaving the main mill site that terminated on the excluded property. The spur lines are denominated HS-1, HS-2, and HN-1 through HN-4 and run roughly parallel to each other in an east-west direction and all tie into a main line running north-south. Only HS-1, HS-2, and HN-1, which are predominately on the excluded property, are at issue in this case. In addition to purchasing track on the excluded property, plaintiff obtained the right to mine the slag piles there.

The 25 miles of track, only a portion of which is at issue here, was originally purchased from the bankruptcy estate by the Williams Family Limited Partnership ("WFLP") in 2001. WFLP quickly entered into the business of storing railcars on the track. After GIP purchased the underlying real estate for much of the track, WFLP began splitting some of its revenue from its railcar storage business with GIP. In December of 2005, GIP

purchased, among other things, all of the railroad track that WFLP owned and soon after continued to use it to store railcars. At the time of trial, GIP was still engaged in the railcar storage business.

The bankruptcy and subsequent disposition of Gulf States Steel's assets coincided with the EPA's attempt to pursue an environmental cleanup at the site under the authority of CERCLA. As part of the environmental cleanup, CMC, Inc., a contractor for the EPA, was tasked with reducing the size of the north and south slag piles on the excluded property. Harsco Corporation, another EPA contractor, processed the material from the piles, which involved using a magnet to separate out ferrous metallic material that could be sold as recyclable scrap. In separate litigation, plaintiff is pursuing claims against the United States regarding its asserted rights in that material. *See Gadsden Industrial Park, LLC v. United States*, Fed. Cl. No. 10-757. After the recyclable scrap was removed by Harsco Corporation, large amounts of nonmarketable material remained, some of which ended up covering portions of the spur lines that GIP believed it owned.[2]

During its clean up efforts on the excluded property, EPA removed portions of HS-1 and HS-2 and covered part of HN-1. Prior to this time, GIP had not used these spur lines as part of its railcar storage business. GIP had, however, used the nearby HN-2 and HN-3 spur lines to store railcars before EPA arrived on site. GIP's site manager, Jerry Stephens—who, with the exception of a period of nine months, had worked on the Gulf States Steel site since 1966—notified Mr. Casey about the removal and burial of the HS-1, HS-2, and HN-1 rails. Mr. Casey, who was based out of Pittsburgh, then asked Mr. Stephens to measure the amount of track that was taken or covered. Mr. Casey also asked Mr. Stephens whether the rail lines at issue had ever been used. Mr. Stephens told Mr. Casey that the spur lines had been used in the past. At trial, Mr. Stephens explained that his answer to Mr. Casey's question

---

[2] In separate litigation in the United States District Court for the Northern District of Alabama, GIP pursued a conversion claim against CMC, Inc. and Harsco Corporation for the same rail that it alleges in this action that the government took. On August 5, 2016, the district court issued a memorandum opinion ruling against GIP, holding that the track at issue was a fixture and that, under Alabama state law, a claim for conversion could not be brought for a fixture. *Gadsden Industrial Park, LLC v. CMC, Inc.* 2016 WL 4158138 (N.D. Ala. 2016).

was with respect to all the spur lines on that part of the property, not just the spurs that are at issue. Mr. Stephen's further explained at trial that, for roughly a two-year period in the early 2000s, the spur lines at issue were used by a company referred to as "Regional" to load railcars with scrap from the piles in an apparent effort to recycle the material for the benefit of the bankruptcy estate.

On July 19, 2013, after speaking with Mr. Casey, counsel for GIP wrote a letter to Susan Capel, associate regional counsel for EPA, claiming that the agency's CERCLA activities had "converted" approximately one mile of track on the excluded property. The letter asserts that

> GIP owned a number of spurs which GIP used to store railroad cars. The installed track therefore possessed inherent value, but it also possessed additional value as it was being used. GIP is entitled to have the track replaced as it was, or alternatively is entitled to the full value of the track as installed. GIP's estimates to replace the track . . . reflect roughly $240,000 for the material, and $120,000 for installation. That amounts to roughly $360,000. There will also be grading needed for the re-installation of the track. We estimate that grading will cost another $3,800.

DX 6 at 13.[3] Defendant contends that the assertion by counsel that the spurs were used to store railroad cars was false. Plaintiff concedes that this statement is inaccurate to the extent that it suggests the spurs for which compensation was being claimed were then being used to store railroad cars.

When she received this letter, Ms. Capel emailed counsel for GIP, questioning GIP's use of the track, among other things. When GIP's counsel relayed the EPA's concerns to Mr. Casey, Mr. Casey made no further inquiry. When asked at trial why he did not follow up with Mr. Stevens, Mr. Casey testified as follows:

> I'm busy. I get probably 50 emails a day. I had phone calls, interruptions. So I sort of have to balance my time. If I think

---

[3] "DX" refers to admitted exhibits offer by defendant; "PX" refers to admitted exhibits offered by plaintiff.

4

> something's an emergency or something's very important, I do it. If I think it's not so important, I don't do it. . . . [i]n this case, I didn't see [it as] necessary . . . to recall Jerry.

Trial Transcript ("Tr.") 159-60. Mr. Casey further testified that he still wanted the track replaced after he learned that GIP was not using the tracks to store railcars at that time.

On August 26, 2013, GIP's counsel responded to Ms. Capel with a second letter, repeating the claim that GIP used the spur lines at issue:

> You previously stated your belief that GIP did not use any of the track that is now covered, since you believed that the track had been completely covered 'for decades'. That, too, is not correct. GIP did use all three lines. I am advised that <u>perhaps</u> Gulf States Steel had previously covered the <u>ties</u>. However, I am told that the <u>rail</u> was definitely not covered prior to the EPA's involvement on-site, and indeed was operable, and being operated by GIP.

*Id*. at 15 (emphasis in the original). Plaintiff concedes that the assertion of current use of the spurs was inaccurate.

On May 1, 2015, the government filed an amended answer to include its counterclaims under the False Claims Act, 31 U.S.C. §§ 3729-3733 (2012). On May 19, 2017, the court issued an order granting two motions *in limine* filed by GIP, which, *inter alia*, had the effect of reducing the government's ability to pursue two false claims—one for each letter—to just one.

DISCUSSION

For the court to find GIP liable for a civil penalty under the False Claims Act, the government must show by a preponderance of the evidence that "(1) [GIP] presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; [and] (3) [GIP] knew the claim was false or fraudulent . . . ." *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed. Cir. 1994). Under the False Claims Act, GIP will be found to have acted knowingly if it acted with actual knowledge, in deliberate ignorance of the truth or falsity of the information it presented, or in reckless disregard of the truth or falsity of the information it

presented. 31 U.S.C. § 3729(b)(1). Here, the government only argues that GIP recklessly disregarded the falsity of claims it made in the two letters it sent EPA in the summer of 2013. Specifically, the government focuses on GIP's assertions that it was using the spur lines in connection with its railcar storage business.

As we stated on the record at the conclusion of trial, we are unable to find that GIP acted in reckless disregard to the falsity of the claim that it used the spur lines at issue to store railcars. We are satisfied that GIP's statement regarding the current storage of railcars, which plaintiff admits was incorrect, stems from a miscommunication between Mr. Casey and Mr. Stephens—both of which we found to be highly credible witnesses. The incorrect statement found its way into the letter after Mr. Casey asked Mr. Stephens whether the spur lines had been used. Mr. Stephens, considering all the spur lines on the eastern, excluded portion of the property and not just those at issue, answered that the track had been used and that the track was usable. As he explained at trial, Mr. Stephens did not distinguish in his answer between types of use or specific tracks. HS-1, HS-2, and HN-1, the tracks at issue here, had indeed been used to carry off scrap by a company mining the slag piles as recently as 2002. Also, the nearby HN-2 and HN-3 rail spurs were used to store railcars up until EPA arrived on site. In Mr. Stephens' mind, all five spur lines were suitable for storage, and that suitability ended when three of the tracks were covered or pulled up. While GIP's statement was not literally true, it would have been immaterial to the company; the track had been useable and no longer was. We cannot say that the incorrect statement that GIP was then presently storing cars on HS-1, HS-2, and HN-1 stemming from this miscommunication was made with reckless disregard for the truth.[4] Accordingly, we hold that GIP did not violate the False Claims Act.

GIP's second letter, sent after Ms. Capel pushed back on the assertions made in the initial letter, presents a closer question. Unquestionably, Mr. Casey

---

[4] We note that Mr. Stephens testified that GIP is currently using what is left of HS-1 and HS-2 to store railcars and that what is left of HN-1 is also in use today. According to Mr. Stephens, railcars were not stored on the track at issue at the time of the letters because GIP did not have enough cars to cause a need to put them there. Even though the spur lines at issue were not used at the time of the letters, we are satisfied that GIP wanted to make use of all rail it believed it owned in order to increase their capacity.

should have followed up directly with Mr. Stevens after Ms. Capel challenged the veracity of GIP's initial statements. However, we cannot say that his failure to do so rose to the level of recklessness. Mr. Casey knew that GIP stored a number of railcars across the property and, relying on his initial conversation with Mr. Stevens, assumed that the track at issue was being used as part of GIP's larger operation.  Because GIP was not at full capacity at the time, Mr. Casey's understanding was incorrect.  However, even though the spurs were not being used at the time, it was GIP's desire to use the spurs if the need for more storage capacity arose, and it has in fact done so. Mr. Casey viewed it as a single operation in which the track is fungible. His desire was to have the track replaced in order to increase the capacity of his railcar storage business to the level that he believed he purchased from WFLP.  Under the circumstances, Casey's assumption that he knew as much as he needed to know about GIP's use of the track does not rise to the level of reckless fraud.

## CONCLUSION

Because we find that plaintiff's statements, though inaccurate, did not rise to the level of recklessness, defendant's counterclaim must be dismissed. The Clerk of Court is directed to dismiss both the complaint and defendant's counterclaim and enter judgment accordingly.  No costs.

s/Eric G. Bruggink<br>
ERIC G. BRUGGINK<br>
Senior Judge