# In the United States Court of Federal Claims

No. 13-924L
(Filed: January 5, 2018)
NOT FOR PUBLICATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| GADSDEN INDUSTRIAL PARK, LLC, | Attorney fees; False Claims Act, 31 U.S.C. § 3729(b)(1) (2012); Equal Access to Justice Act, 28 U.S.C. § 2412(d) (2012); whether defendant's counterclaim was substantially justified. |
| *Plaintiff*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Edward I. Levicoff*, Pittsburgh, PA, for plaintiff.

*Eric John Singley*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

———————————

## OPINION ON ATTORNEY FEES
———————————

BRUGGINK, *Judge*.

On August 18, 2017, we entered judgment for plaintiff Gadsden Industrial Park, LLC ("GIP") with respect to defendant's counterclaim. Currently pending is plaintiff's motion for an award of attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (2012) ("EAJA"). The matter is fully briefed and oral argument is deemed unnecessary. Because the government was substantially justified in asserting its counterclaim, plaintiff's motion is denied.

GIP initiated its claim as a Fifth Amendment takings claim. It asserted

that the government, operating through the Environmental Protection Agency ("EPA"), took plaintiff's personalty located at a former steel mill site during a Comprehensive Environmental Response, Compensation, and Liability Act[1] ("CERCLA") operation.  The former mill operator had gone into bankruptcy, and GIP later acquired approximately twenty-five miles of railroad track traversing the site from an entity that had purchased the assets from the bankruptcy estate.  Defendant was permitted to amend its answer to assert a fraud counterclaim, in which it contended that counsel for GIP made materially false statements to the EPA in asserting GIP's demand for compensation for the track it alleged was taken in violation of the False Claims Act, 31 U.S.C. § 3729(b)(1) (2012).

On January 30, 2017, defendant filed a motion for summary judgment on GIP's affirmative claim, and plaintiff later indicated its intent not to dispute the motion.  Accordingly, the court granted defendant's motion for summary judgment on March 31, 2017, but deferred entry of final judgment due to the pendency of the counterclaim.  We then set the matter for trial, which was held on June 30, 2017.  At the conclusion of trial, the court announced its decision to deny the counterclaim, a ruling that was confirmed by an order dated August 18, 2017.  The plaintiff thereafter filed its request for fees under EAJA.  The facts recited below are drawn from our prior ruling on the merits of the counterclaim.

## BACKGROUND

GIP is a limited liability company formed by the Casey family, which operates a business in Pennsylvania, Casey Equipment, which primarily buys and sells equipment and parts associated with the steelmaking industry.  GIP is an independent entity formed for the sole purpose of owning and operating an industrial park in Gadsden, Alabama. Don Casey, founder of Casey Equipment, is the managing partner of GIP. He testified at trial.

The land and buildings that form the principal assets of GIP were purchased directly or indirectly out of the bankruptcy estate of Gulf States Steel, which, along with its predecessors, had operated a steel mill in Gadsden, Alabama, for decades.  The track at issue in plaintiff's claim is part of a much larger rail system.  GIP purchased 420 acres of land underlying most of the

---

[1] 42 U.S.C. §§ 9601-9675 (2012).

track from an overall site of approximately 761 acres.  It also acquired track on an adjoining parcel of land, but it did not purchase the land underlying that stretch of track (referred to hereafter as the "excluded property").  The excluded property was the site of multiple piles of slag and waste material that had accumulated during the life of the steel mill.  There were at least six spur lines leaving the main mill site that terminated on the excluded property.  The spur lines are denominated HS-1, HS-2, and HN-1 through HN-4 and run roughly parallel to each other in an east-west direction and all tie into a main line running north-south.  Only HS-1, HS-2, and HN-1, which are predominately on the excluded property, were at issue in this case.  In addition to purchasing track on the excluded property, plaintiff obtained the right to mine the slag piles there.

The twenty-five miles of track, only a portion of which is at issue here, was originally purchased from the bankruptcy estate by the Williams Family Limited Partnership ("WFLP") in 2001.  WFLP quickly entered into the business of storing railcars on the track.  After GIP purchased the underlying real estate for much of the track, WFLP began splitting some of its revenue from its railcar storage business with GIP.  In December of 2005, GIP purchased, among other things, all of the railroad track that WFLP owned, and soon after GIP continued to use it to store railcars.  At the time of trial, GIP was still engaged in the railcar storage business.

The bankruptcy and subsequent disposition of Gulf States Steel's assets coincided with the EPA's attempt to pursue an environmental cleanup at the site under the authority of CERCLA.  As part of the environmental cleanup, CMC, Inc., a contractor for the EPA, was tasked with reducing the size of the north and south slag piles on the excluded property.  Harsco Corporation, another EPA contractor, processed the material from the piles, which involved using a magnet to separate out ferrous metallic material that could be sold as recyclable scrap.  In separate litigation, plaintiff is pursuing claims against the United States regarding its asserted rights in that material.  *See Gadsden Indus. Park, LLC v. United States*, Fed. Cl. No. 10-757.  After the recyclable scrap was removed by Harsco Corporation, large amounts of nonmarketable material remained, some of which ended up covering portions of the spur lines that GIP believed it owned.[2]

---

[2] In separate litigation in the United States District Court for the Northern District of Alabama, GIP pursued a conversion claim against CMC, Inc. and

During its clean up efforts on the excluded property, EPA removed portions of HS-1 and HS-2 and covered part of HN-1. Prior to this time, GIP had not used these spur lines as part of its railcar storage business. It had, however, used the nearby HN-2 and HN-3 spur lines to store railcars before EPA arrived on site. GIP's site manager, Jerry Stephens—who, with the exception of a period of nine months, had worked on the Gulf States Steel site since 1966—notified Mr. Casey about the removal and burial of the HS-1, HS-2, and HN-1 rails. Mr. Casey, who was based out of Pittsburgh, then asked Mr. Stephens to measure the amount of track that was taken or covered. Mr. Casey also asked Mr. Stephens whether the rail lines at issue had ever been used. Mr. Stephens told Mr. Casey that the spur lines had been used in the past. At trial, Mr. Stephens explained that his answer to Mr. Casey's question was with respect to all the spur lines on that part of the property, not just the spurs that are at issue. Mr. Stephens further explained at trial that, for roughly a two-year period in the early 2000s, the spur lines at issue were used by a company referred to as "Regional" to load railcars with scrap from the piles in an apparent effort to recycle the material for the benefit of the bankruptcy estate.

On July 19, 2013, after speaking with Mr. Casey, counsel for GIP wrote a letter to Susan Capel, associate regional counsel for EPA, claiming that the agency's CERCLA activities had "converted" approximately one mile of track on the excluded property. The letter asserted that

> GIP owned a number of spurs which GIP used to store railroad cars. The installed track therefore possessed inherent value, but it also possessed additional value as it was being used. GIP is entitled to have the track replaced as it was, or alternatively is entitled to the full value of the track as installed. GIP's estimates to replace the track . . . reflect roughly $240,000 for the material, and $120,000 for installation. That amounts to roughly $360,000. There will also be grading needed for the re-

---

Harsco Corporation for the same rail that it alleges in this action that the government took. On August 5, 2016, the district court issued a memorandum opinion ruling against GIP, holding that the track at issue was a fixture and that, under Alabama state law, a claim for conversion could not be brought for a fixture. *Gadsden Indus. Park, LLC v. CMC, Inc.,* 4:14-CV-39-KOB, 2016 WL 4158138 (N.D. Ala. Aug. 5, 2016).

> installation of the track.  We estimate that grading will cost
> another $3,800.

DX 6 at 13.[3]  Defendant contends that the assertion by counsel that the spurs
were used to store railroad cars was false.  Plaintiff concedes that this
statement is inaccurate to the extent that it suggests the spurs for which
compensation was being claimed were then being used to store railroad cars.

When she received this letter, Ms. Capel emailed counsel for GIP,
questioning GIP's use of the track, among other things.  When GIP's counsel
relayed the EPA's concerns to Mr. Casey, Mr. Casey made no further inquiry.
When asked at trial why he did not follow up with Mr. Stevens, Mr. Casey
testified:

> I'm busy. I get probably 50 emails a day. I had phone calls,
> interruptions. So I sort of have to balance my time.  If I think
> something's an emergency or something's very important, I do
> it. If I think it's not so important, I don't do it. . . . [i]n this case,
> I didn't see [it as] necessary . . . to recall Jerry.

Trial Transcript ("Tr.") 159-60.  Mr. Casey further testified that he still wanted
the track replaced after he learned that GIP was not using the tracks to store
railcars at that time.

On August 26, 2013, GIP's counsel responded to Ms. Capel with a
second letter, repeating the claim that GIP used the spur lines at issue:

> You previously stated your belief that GIP did not use any of the
> track that is now covered, since you believed that the track had
> been completely covered 'for decades'.  That, too, is not correct.
> GIP did use all three lines.  I am advised that perhaps Gulf
> States Steel had previously covered the ties.  However, I am told
> that the rail was definitely not covered prior to the EPA's
> involvement on-site, and indeed was operable, and being
> operated by GIP.

---

[3] "DX" refers to admitted exhibits offer by defendant; "PX" refers to admitted
exhibits offered by plaintiff.

*Id*. at 15 (emphasis in the original). Plaintiff concedes that the assertion of current use of the spurs was inaccurate.

On May 1, 2015, the government filed an amended answer to include its counterclaims under the False Claims Act, 31 U.S.C. §§ 3729-3733. On May 19, 2017, the court issued an order granting two motions *in limine* filed by GIP, which, *inter alia*, had the effect of reducing the government's ability to pursue two false claims—one for each letter—to just one.

At the conclusion of trial, we ruled against the United States. We were unable to find that GIP acted in reckless disregard to the falsity of the claim that it used the spur lines at issue to store railcars and found that GIP's statement regarding the current storage of railcars stemmed from a miscommunication between Mr. Casey and Mr. Stephens—both of whom we found to be credible witnesses. *Gadsden Indus. Park, LLC v. United States*, Fed. Cl. No. 13-924, at *6 (Aug. 18, 2017). The incorrect statement found its way into the letter after Mr. Casey asked Mr. Stephens whether the spur lines had been used. Mr. Stephens, considering all the spur lines on the eastern, excluded portion of the property and not just those at issue, answered that the track had been used and that the track was usable. As he explained at trial, Mr. Stephens did not distinguish in his answer between types of use or specific tracks. HS-1, HS-2, and HN-1, the tracks at issue here, had indeed been used to carry off scrap by a company mining the slag piles as recently as 2002. Also, the nearby HN-2 and HN-3 rail spurs were used to store railcars up until EPA arrived on site. In Mr. Stephens' mind, all five spur lines were suitable for storage, and that suitability ended when three of the tracks were covered or pulled up. While GIP's statement was not literally true, it would have been immaterial to the company; the track had been useable and no longer was. We concluded that the incorrect statement that GIP was then presently storing cars on HS-1, HS-2, and HN-1, stemming from this miscommunication, was not made with reckless disregard for the truth.

The second GIP letter presented a closer question. Although we held that Mr. Casey should have followed up directly with Mr. Stevens after Ms. Capel challenged the veracity of GIP's initial statements, we declined to find that his failure to do so rose to the level of recklessness. Mr. Casey knew that GIP stored a number of railcars across the property and, relying on his initial conversation with Mr. Stevens, assumed that the track at issue was being used as part of GIP's larger operation. Because GIP was not at full capacity at the time, Mr. Casey's understanding was incorrect. However, even though the

spurs were not being used at the time, it was GIP's desire to use the spurs if the need for more storage capacity arose, and it had in fact done so. Mr. Casey viewed it as a single operation in which the track is fungible. His desire was to have the track replaced in order to increase the capacity of his railcar storage business to the level that he believed he purchased from WFLP. Under the circumstances, Mr. Casey's assumption that he knew as much as he needed to know about GIP's use of the track did not rise to the level of reckless fraud.

Accordingly, we held that plaintiff was not liable for a civil penalty under the False Claims Act, 31 U.S.C. § 3729(b)(1). Pending is plaintiff's motion for reimbursement of attorney fees and costs under EAJA, 28 U.S.C. § 2412(d).

DISCUSSION

There is a general presumption in American jurisprudence that even successful litigating parties absorb their own fees and expenses. The exception plaintiff relies on in EAJA consists of three elements: that 1) as a corporation, plaintiff has a net worth less than $7,000,000 and fewer than 500 employees; 2) that the government's position was not substantially justified; and 3) that special circumstances do not make a shifting of fees inappropriate. *Id.*

Defendant contends that plaintiff has not established any of these elements. Although plaintiff offers the affidavit of Mr. Donald Casey to the effect that GIP has fewer than 500 employees and a net worth less than $7,000,000, defendant questions that the litigation expenses were actually born by the corporation. Defendant suggests that they were absorbed by Mr. Casey himself, who it suggests has not made a similar assertion as to personal entities.

It is unnecessary for us to decide whether plaintiff has established the first and third elements of the test because we are satisfied that it cannot meet the second. Defendant's litigating position here was substantially justified within the meaning of EAJA.

Plaintiff, of course, was unsuccessful on its affirmative claim. Indeed it did not even dispute defendant's motion for summary judgment in that respect. The question is whether the court's rejection of the False Claims Act counterclaim warrants shifting fees incurred unique to the defense against the counterclaim. It does not. The government had ample reason to assert its

counterclaim.  As plaintiff admitted, the factual assertions put forward by plaintiff's counsel on behalf of GIP were inaccurate, material, and repeated despite agency questioning.  Defendant thus had no difficulty presenting evidence that plaintiff put forward a claim for payment which was false.  We preserved the counterclaim for trial primarily on the issue of scienter, which the court believed should be ventilated through testimony and examination.  Ultimately we ruled in favor of plaintiff that it did not act with reckless disregard of the possibility of falsehood, but that was in spite of, not because of, the paper record, which presented sufficient grounds for the government to assert its counterclaim.  The government was acting responsibly in pursuing the counterclaim.[4]

## CONCLUSION

Because the government was substantially justified in asserting its counterclaim, we deny plaintiff's motion for attorney fees and costs. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[4] Plaintiff's assertion that government counsel acted in bad faith by filing the counterclaim is nonsense, as is much of the exaggerated prose in its briefing.